# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CODY HASTINGS MASSASOIT, as           )
Ancillary Administrator of the        )
Estate of Tallas Hastings Tomeny,     )
and STEPHEN PHELPS,                    )
                                       )
                 Plaintiffs,           )
                                       )
          v.                           )      1:04CV00151
                                       )
LANE CARTER, in his official           )
capacity as Sheriff of Moore           )
County, RANDALL BUTLER, in his         )
individual and official capacity       )
as a Deputy with the Moore County      )
Sheriff's Office, and FIDELITY AND     )
DEPOSIT COMPANY OF MARYLAND,            )
                                       )
                 Defendants.           )

## MEMORANDUM OPINION AND ORDER

**Eliason, Magistrate Judge**

This case arises out of tragic events that unfolded on the day of February 23, 2002 in Moore County, North Carolina. On that date, defendant Moore County Deputy Sheriff Randall Butler shot and killed Tallas Tomeny and shot and seriously wounded plaintiff Phelps, both Green Beret Special Forces soldiers. Tomeny's claims are brought by his father, Cody Massasoit, who is the administrator of his estate. Defendant Carter is the current Sheriff of Moore County, and defendant Fidelity is the surety on a bond that sheriffs are required to post under North Carolina law. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and state law –– the main assertion being that defendant Butler employed excessive

force.  Defendants seek dismissal of the action for a number of reasons.

## I.  Facts

The facts surrounding this most unfortunate incident were witnessed directly by Phelps, Butler, and a man named Charles Leiber.  While their testimony concerning the events they witnessed is similar in some ways, it is also different as to certain important facts.  For this reason, the Court will set out the facts as related by each of them.

## A.  Phelps' Facts

Plaintiff Phelps enlisted in the Army in 1995 and served for several years before being selected for training as a Green Beret with the Special Forces.  (Phelps Dep. p. 28)  In February of 2002, he and Tallas Tomeny were soldiers involved in a Special Forces training exercise known as "Operation Robin Sage."  Robin Sage has been conducted for more than forty years in Moore County, North Carolina, and adjacent counties.  During the 2002 Robin Sage exercise, the soldiers parachute into the area, set up a base camp at a local farm, and then join with "friendly" civilian volunteers to attempt to overthrow the government of a fictional country known as "Pineland."  The exercise is quite detailed, with participants even being issued Pineland currency known as "don."  The soldiers and civilians are expected to remain in their roles throughout the exercise and the soldiers attempt to accomplish their missions, avoid capture, and retain possession of their weapons.  (Id. pp.

-2-

69-90) Law enforcement officers sometimes participated in the training. (Id. p. 89)

On February 23, 2002, Phelps and Tomeny left their base camp for reconnaissance on a railroad bridge. They received a ride from Leiber, who was a civilian assisting the military in his free time. Leiber drove a Ford Ranger pick-up truck with Tomeny giving directions in the passenger seat. (Leiber Dep. pp. 29-31) Tomeny possessed a backpack containing various items, including the two halves of an M-4 assault rifle. The rifle was in the main compartment of the backpack. (Phelps Dep. p. 188) Phelps rode in the bed of the truck with a tackle box and two fishing rods. All wore plain clothes. Their "cover story" was that they were a farmer and two migrant workers looking for a place to fish on their day off. (Leiber Dep. pp. 34-36)

At some point, the men passed a patrol car driven by Butler. When they later passed him a second time, Butler initially followed them and then activated his blue lights in order to stop the truck. Leiber pulled off the road and into a church parking lot. A few days earlier, Phelps was involved in an incident where a group of soldiers had been stopped by local law enforcement and reacted poorly. He believed that the stop by Butler was "set up" to see how they reacted to being stopped. (Phelps Dep. pp. 162-163, 172-173, 182-183)

Butler parked his car eight to ten feet behind the truck, ran the license plate of the truck and then approached Leiber. Leiber produced his license and went to the front passenger seat of

-3-

Butler's car.  Butler and Leiber talked for some time in the car, but could not be heard by Phelps and Tomeny.  (<u>Id</u>. pp. 175-177) Butler eventually left Leiber in the front seat of the car and approached Tomeny's side of the truck.  Phelps was sitting/lying in the passenger side of the bed of the pickup with his back against the cab and his eyes mostly closed.  He pretended to be asleep, but had his eyes open enough to see.  (<u>Id</u>. pp. 181-182)

Tomeny told Butler they were migrant workers going fishing on their day off.  Butler asked Tomeny to exit the truck and to bring the backpack with him.  Tomeny followed his training and tried to bribe Butler with some of the "don" that he was carrying, but Butler did not acknowledge him.  (<u>Id</u>. p. 184)  Eventually, Butler and Tomeny ended up at the rear of the truck with the tailgate down.  Butler was standing toward the driver's side of the truck and Tomeny was toward the passenger side.  The backpack was between them.  (<u>Id</u>. pp. 181-182, 195)  Phelps, still pretending to sleep, and Leiber watched from their respective positions in the bed of the truck and the patrol car.

Butler was interested in the backpack and asked Tomeny to open it.  Tomeny opened some of the smaller outer compartments of the backpack and removed such items as a thermos, gloves, a T-shirt, a black toboggan, and a meal-ready-to-eat (MRE).  (<u>Id</u>. p. 186)  He also continued to try to bribe Butler by showing the don and saying things to the effect of: "It does not have to be this way.  We can work together and make Pineland a good place.  Our governments can work together."  Butler did not respond, but kept asking to see

-4-

inside the backpack. (Id. pp. 182-184, 278) Tomeny responded by stalling: turning the bag upside down and pretending he did not know how to open it. The zipper to the main compartment with the M-4 rifle was covered by a flap and Phelps maintains that Tomeny never opened that zipper. (Id. pp. 191-192, 196)

According to Phelps, Butler eventually got upset and grabbed the bag away from Tomeny. At one point, Tomeny was pulled off balance toward Butler. Butler was able to wrest the backpack from Tomeny with his left hand and throw it across his body to the ground near the front driver's side wheel of the patrol car. (Id. pp. 197-199) He also pushed Tomeny back. Phelps claims that Butler then drew his pistol with the safety off. Tomeny had his hands up. Butler reholstered the pistol, pulled his pepper spray, and began spraying Tomeny in the face. (Id. pp. 200, 207-208) Tomeny backed away, toward the passenger side of the truck, while screaming and cursing. The truck had side boards on the bed rails and Tomeny largely passed out of Phelps' view behind the boards as he backed up. (Id. pp. 205)

Phelps, not wanting to be pepper sprayed, stood, jumped out of the back of the truck, and ran to grab the backpack. He believed that all of this was still part of the training exercise. Therefore, he intended to grab the backpack and run to the edge of the woods to distance himself from Butler and formulate a plan. (Id. pp. 207) Instead, he heard two rapid shots behind him. He tried to stop and turn, but slipped on the wet pavement and fell. After landing on all fours, he saw Butler turn to face him and he

-5-

heard two more shots.  (Id. pp. 220-221, 241-243)  One of the last
two shots hit him in the right arm; the other hit him in the chest.
The bullet that hit his chest punctured his diaphragm, liver and
intestines before lodging in his left hip.  (Id. p. 243)  As Phelps
lay on the ground, Butler approached him.  Phelps cursed him and
asked how he could not know they were in the military.  Butler
allegedly told him to shut up and stay down or he would shoot him
again.  (Id. p. 248)

Tomeny had been shot in the chest and was pronounced dead at
the scene.  Phelps was hospitalized for thirteen days.  He has
largely recovered from his wounds and remains on active duty in the
Special Forces.  However, he has permanent damage to the ulnar
nerve in his right arm, slightly decreased lung capacity and liver
function, and a heightened risk of blockage in his colon at the
point where it was resected.  (Id. pp. 304-310)

### B.  Leiber's Facts

Leiber's rendition of the facts is not materially different
from Phelps' to the point that they were stopped by Butler.  He
states that he drove as Tomeny gave directions, but that he did not
pay close attention to what Tomeny was doing or see Butler until
shortly before he pulled them over.  He does add that when Butler
pulled in behind them, Tomeny told him to "lose him."  Leiber then
made a couple of turns, but Butler stayed with him and then pulled
him over.  (Leiber Dep. pp. 39, 210-211)

The first significant addition or difference begins at the
point that he and Butler entered the patrol car.  Leiber claims

-6-

that Butler questioned him as to where he lived and what he was doing and he replied that he was from Pineland and that the men in his truck were two migrant workers who were going fishing. He claimed to have picked them up in Pineland. In response to further questioning, he stated that the men were doing "recon." (Id. p. 44)

After Butler left the patrol car, Leiber could watch the subsequent events, but heard very little. He watched as Butler got Tomeny out of the truck and had him place the backpack on the tailgate. He then observed Tomeny take items out of the bag. (Id. p. 53) He testified in his deposition that when it "appeared" Tomeny was not going to show any more of the contents of the bag, Butler pulled out his pistol and then reholstered it. He states that Tomeny responded by pulling an orange from the bag. (Id. pp. 53-54) Leiber does not remember anyone opening the main compartment of the backpack. (Id. p. 61) Butler and Tomeny then exchanged a few words before both reaching for the bag.

Leiber stated that both men were "getting ill" and a tussle over the bag followed. Butler responded by pulling his pepper spray and spraying Tomeny directly in the face from a distance of about sixteen or seventeen inches. Tomeny began "hollering" and "shaking his head" with pepper spray streaming from his face as he retreated around the passenger side of the truck. (Id. pp. 54-55, 86, 251) Leiber noted that Butler was yelling across the radio for back up as he was spraying. Leiber claims Butler just kept spraying him until the pepper spray appeared to run out. (Id. pp.

-7-

55)  Leiber does not remember ever observing Tomeny's hands reach behind his back.  (Id. p. 256)

According to Leiber, when the pepper spray seemed to run out, Butler immediately pulled his pistol and fired two shots at Tomeny. At that time, Phelps jumped off of the truck and ran.  Leiber stated in his deposition that he was unsure where the backpack was when Phelps ran.  (Id. pp. 54-55, 253)  Phelps was then shot, but Leiber could not see him or see what he was doing until after he was shot.  (Id. p. 55)

### C.  Butler's Facts

On February 23, 2002, Butler was on patrol in northern Moore County.  While he had general knowledge that the military sometimes trained in Moore County, he did not know of the existence of the Robin Sage exercise, did not know its details, and did not know that any exercise was being conducted in the area that day. (Butler Dep. pp. 19-20, 417-419)  He had, however, heard that there had recently been a series of property crimes in the area, including burglaries of homes and outbuildings.  (Id. pp. 176-177)

While driving, Butler passed Leiber's pick-up truck pulled over on the side of the road with "someone or something" in the back.  He simply noted the presence of the truck, but did not stop. (Id. pp. 193-194)  About an hour and a half later, while parked at an intersection, he observed the truck drive by.  Butler testified at his deposition that he made eye contact with the person in the passenger seat (Tomeny) and that Tomeny responded by ducking down and pushing a large object from his lap to the floor.  Butler also

-8-

saw a man riding and sleeping in the back of the truck. He
considered this unusual given that the weather was chilly. (<u>Id</u>.
pp. 200-201)

After Butler made eye contact with the passenger, the truck
made an immediate right turn. He decided to follow it. The truck
then made a turn onto a road that loops around less than half a
mile and almost returns to the place where he first saw the truck.
Because of (1) the unsolved property crimes in the area, (2) seeing
the same truck in the area earlier in the day with a person riding
in the back and apparently asleep in cold weather, (3) the actions
of the passenger, and (4) the turns that the truck made after being
sighted and followed, Butler became suspicious and pulled the truck
over. (<u>Id</u>. pp. 201-203)

Butler spoke with Leiber and asked him to come to the car.
Leiber complied. In the car, Butler looked at Leiber's license and
asked if Leiber was from the area. He said that he was not.
According to Butler, Leiber told him first that he and his
passengers were going fishing, then added that they were migrant
workers. When asked which it was, Leiber allegedly replied that he
was trying to find work for migrant workers. Butler thought this
answer to be odd because it was winter and there were no crops in
the fields. Finally, Leiber told Butler he was "on a recon." (<u>Id</u>.
pp. 216-218, 236, 278)

At this point, Butler left Leiber in the car and approached
Tomeny's window. As Tomeny rolled down the window, Butler noticed
the backpack on the floor of the truck and felt that Tomeny was

-9-

uncomfortable and trying to hide the bag. He asked Tomeny to step out and show him the contents of the bag. He also noticed that Phelps continued sleeping or pretending to sleep and considered this suspicious under the circumstances. (Id. pp. 218-219)

Butler does not recall any attempt by Tomeny to bribe him, but was instead focused on the backpack. He asked Tomeny to open it and Tomeny said he would, but did not. Butler testified in his deposition that Tomeny acted oddly by unzipping the bag halfway and then quickly zipping it closed again. Butler then unzipped the backpack himself and saw what he thought were two machine guns in the bag. (Id. pp. 219-220)

After Butler saw the guns, he and Tomeny struggled over the bag. Butler was able to take the bag from Tomeny and throw it near the front, driver's side tire of his patrol car. When he turned back, he claims that he felt and saw Tomeny's hands near the pistol on his right hip. He then drew the gun with his right hand and pushed Tomeny away with his left while commanding him to stay back. When Tomeny did move away, Butler reholstered his gun, but he states that Tomeny moved toward him again. Butler then attempted to pepper spray Tomeny. (Id. pp. 251-253)

Butler believed that Tomeny turned his head, causing the pepper spray to miss him. He claims that he heard Tomeny yell, "It's too late. It's too late, you're dead." Tomeny then began pointing and saying "You're dead. You're dead." Finally, he yelled to Phelps, "Go ahead. Shoot him. Kill him; kill him." He also screamed "Kill him now." (Id. p. 253) Phelps then got up

-10-

from the truck, jumped out, and rushed toward the backpack. Butler believed that Phelps was going for the guns and that he actually saw part of the guns come out of the bag as Phelps grabbed it and turned to face him. He states that he also saw, with his peripheral vision, Tomeny reaching behind his back as if to pull something from his pants. Butler claims he warned Phelps verbally but, when Phelps did not respond, he then shot Phelps. After shooting Phelps, he turned to face Tomeny. Because Tomeny was still reaching behind his back as if for a weapon, he shot Tomeny and retreated to the back of the car where he could cover Leiber while calling for backup. (Id. pp. 253-255, 302, 315)

## II. Claims

Based on their version of the facts, plaintiffs filed suit against Butler in both his individual and official capacities, Lane Carter in his official capacity,[1] and Fidelity and Deposit Company of Maryland. They claim that Butler violated Tomeny and Phelps' rights under 42 U.S.C. § 1983 by stopping the vehicle in which Phelps and Tomeny were riding without sufficient reason to do so and then by using excessive force against them in violation of their rights under the United States Constitution. They also raise claims under North Carolina law for assault and battery and negligence. As to the Moore County Sheriff's Office, they allege it violated § 1983 by (1) engaging in a pattern or practice of allowing officers to use excessive force without supervision or

---

[1]Carter was not actually Sheriff at the time of the shootings. However, because the suit is only against him in his official capacity, he is the named defendant in the suit, which is really against the Sheriff's Office.

consequences and that this pattern or practice led to plaintiffs'
injuries and (2) the Sheriff's Office failed to properly train
Butler in the use of force.  Additionally, they assert that the
Sheriff, as Butler's employer, is liable for his state law torts
and directly liable for failing to train officers to recognize
participants in the Robin Sage exercise.  Finally, Fidelity is the
surety on a statutory bond that is required of sheriffs in North
Carolina under N.C. Gen. Stat. § 162-8.  Defendants have moved for
summary judgment as to all of plaintiffs' claims.

### III.  Legal Standards

Summary judgment will be granted only "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with affidavits, if any, show that there is no genuine
issue as to any material fact and that the moving party is entitled
to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Court
must view the evidence in a light most favorable to the non-moving
party.  Pachaly v. City of Lynchburg, 897 F.2d 723, 725 (4th Cir.
1990).  When opposing a properly supported motion for summary
judgment, the party cannot rest on conclusory statements, but must
provide specific facts, particularly when that party has the burden
of proof on an issue.    Id. "The summary judgment inquiry thus
scrutinizes the plaintiff's case to determine whether the plaintiff
has proffered sufficient proof, in the form of admissible evidence,
that could carry the burden of proof of his claim at trial."
Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993)
(emphasis added).

-12-

As for plaintiffs' claims arising under state law, the Court must follow the rulings of the state's highest courts or, if state law is unclear, rule as it appears the highest state court would rule on the issue. <u>Private Mortg. Inv. Services, Inc. v. Hotel and Club</u>, 296 F.3d 308, 312 (4th Cir. 2002). The rulings of intermediate appellate state courts are strongly persuasive authority that will not be disregarded. <u>Assicurazioni Generali, S.p.A. v. Neil</u>, 160 F.3d 997, 1002 (4th Cir. 1998).

## IV.  Discussion

### A.  Claims Against Butler

Because the potential liability of defendants Carter and Fidelity is largely derived from the claims against Butler, the claims against Butler will be discussed first. If he did not violate plaintiffs' rights or commit a state law tort against them, then the remaining defendants cannot be liable based on his actions or any part they played that led to those actions.

### 1.  Initial Stop

Plaintiffs' first claim against Butler is their allegation that he violated their right to be free from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution when he stopped Leiber's truck without any legal justification. Butler responds that the stop of the truck was entirely proper and that, in any event, he is entitled to qualified immunity on this claim.

As for Butler's assertion of qualified immunity, a police officer is immune from claims brought under § 1983 unless his

-13-

conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).  The Court's "first task is to identify the specific right that the plaintiff[s] assert[] was infringed by the challenged conduct." Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998).  The second is to "determine whether that right was clearly established at the time of the incident." Vathekan v. Prince George's County, 154 F.3d 173, 179 (4th Cir. 1998).  Finally, if the right was clearly established, the Court must decide whether a reasonable officer could have believed that his actions were objectively reasonable in light of the circumstances.  Id.; Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994).

It appears the right asserted by plaintiffs is the right not to have the vehicle they were riding in stopped without reasonable suspicion that they were involved in criminal activity.  Butler has not argued this right was not clearly established at the time he stopped Leiber's truck, but only claims that the stop was legal, or at least a reasonable officer in his position could have thought the stop was legal.

In support of his claim that the stop of the truck was legal, Butler points to six facts:  (1) the unsolved property crimes in the area, (2) his multiple sightings of the truck in the area that day, (3) the unusual fact that Phelps was sleeping or pretending to sleep in the back of the truck in cold weather, (4) Tomeny ducking down and trying to hide an object that had been in his lap when he

-14-

made eye contact with Butler, (5) the turn the truck made immediately after Tomeny saw Butler, and (6) the later turns the truck made after Butler followed it. (Butler Brf. p. 10) He asserts that an officer faced with these facts could reasonably conclude that the occupants of Leiber's truck were "casing" targets for future robberies.

Plaintiffs attempt to counter Butler's argument by first noting that the truck violated no traffic laws and had a current and valid inspection sticker and registration. This is not in dispute, but it is also not relevant. Butler makes no claim that he stopped the truck because it violated a traffic law or was not properly registered or inspected.

Next, plaintiffs challenge certain of the facts that Butler relies on to establish reasonable suspicion. They describe Butler's reliance on "a rash of property crimes" as a "fabricated, after-the-fact explanation" for the stop. (Pl. Brf. p. 9) They report that a review of the files from the Moore County Sheriff's Office "shows no upswing in property crimes in the northern part of the county" at that time. (Id.) However, whether there was a statistical "upswing" in property crimes or not, Butler has testified that such crimes were occurring in the area. This testimony is supported by testimony from Robbins police officer Jerry Garner who describes some of the crimes and who himself accidentally stopped some Robin Sage participants while investigating those crimes. (Jerry Garner Aff. ¶¶ 4-5, 7-9; Jerry Garner Dep. Ex. 6)

Finally, plaintiffs challenge Butler's claims that Tomeny ducked and pushed an object from his lap to the floor. To do this, they rely on Leiber's deposition where he states that the backpack remained on the floor of the truck. However, Leiber also admitted that he did not closely watch Tomeny at all times and that he was looking at the road and rear view mirror. (Leiber Dep. pp. 211, 214) He specifically stated that he could not say whether or not Tomeny bent down at the time that they passed Butler. (Id.) At an earlier point, he claimed Tomeny may have bent down reaching for his seat belt. (Leiber Dep. p. 41) Therefore, at most, plaintiffs have raised a dispute as to whether Tomeny pushed the backpack down from his lap to the floor. Otherwise, Butler's proffered evidence remains unchallenged and the Court will use that evidence, minus the allegation that Tomeny pushed the bag to the floor, to determine whether an officer in Butler's place would have had a reasonable suspicion that plaintiffs and Leiber were involved in criminal activity.

The law is quite clear that Butler was justified in stopping Leiber's truck to speak with the occupants and ascertain their identities and intentions. Behavior suggesting that persons are traversing an area to "case" robbery targets has been held to justify an investigatory stop. Terry v. Ohio, 392 U.S. 1, 22-23, 88 S.Ct. 1868, 1880-1881, 20 L.Ed.2d 889 (1968). Butler's multiple sightings of the truck and Phelps' unusual presence in the bed would raise such suspicions here. Likewise, ducking in the presence of law enforcement officers and taking evasive maneuvers

-16-

in a vehicle can also be factors justifying further investigation. United States v. Tate, 648 F.2d 939, 942 (4th Cir. 1981)(attempting to hide face from law enforcement is suspicious behavior); United States v. Smith, 396 F.3d 579, 584-586 (4th Cir. 2005)(evasive acts in a vehicle is suspicious behavior). While all of the behaviors Butler witnessed are behaviors that can have innocent explanations, taken together they also suggest that criminal activity could certainly be afoot. The issue is not a close one. At the very least, a reasonable officer in Butler's position would have certainly have believed that he would be justified in investigating the behavior he witnessed. Butler is entitled to summary judgment on this claim both directly and on his assertion of qualified immunity.

### 2. Shooting

Plaintiffs' central claim is that Butler used excessive force when he shot Tomeny and Phelps. They assert that this violated their rights under the Fourth Amendment of the United States Constitution and § 1983. As with the prior claim, Butler argues that he is entitled to summary judgment directly and on the basis of qualified immunity.

Excessive force claims stemming from investigatory stops are controlled by the Fourth Amendment's prohibition against unreasonable seizures. Graham v. Conner, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Because the Fourth Amendment is premised on the idea of "reasonableness," the Court must determine whether a particular level of force was objectively

-17-

reasonable given the particular circumstances in a case. Plaintiffs' claim is that the deadly force used against them was objectively unreasonable given the facts in this case. Again, the parties appear to agree on the basic law of the case--that is, that plaintiffs had an established right not to have deadly force used against them unless a reasonable officer in Butler's place could have believed they posed a serious threat to his safety or the safety of others. See Tennessee v. Garner, 471 U.S. 1, 11, 109 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). The difference between them is whether such an officer could have thought this based on the facts here.

Cases such as the one at bar epitomize the particular difficulties in which police officers often find themselves. The United States Supreme Court has summarized the situation in the following manner:

> Because 'police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation,' the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective. We set out a test that cautioned against the '20/20 vision of hindsight' in favor of deference to the judgment of reasonable officers on the scene. Graham sets forth a list of factors relevant to the merits of the constitutional excessive force claim, 'requir[ing] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.

-18-

Saucier v. Katz, 533 U.S. 194, 205, 121 S.Ct. 2151, 2158, 150 L.Ed.2d 272 (2001)(citations omitted).

Butler's argument that he acted reasonably in shooting Phelps and Tomeny is based essentially on his facts as set out above. They are, to summarize, that (1) Phelps, Tomeny, and Leiber acted oddly, (2) Tomeny stalled in opening the bag, (3) Butler then opened the main compartment himself, saw the assault rifle, and threw the bag near his car, (4) Tomeny made physical contact with him, so he pulled his gun on Tomeny and then reholstered it and tried to spray Tomeny to keep him away, (5) Butler believed the spray missed Tomeny, (6) Tomeny yelled for Phelps to kill Butler and Phelps then grabbed the bag and turned to face Butler, (7) Phelps was trying to remove the rifle from the bag as Tomeny reached behind his back, and (8) Butler warned Phelps to stop before shooting Phelps and then Tomeny, while they remained in these threatening positions.

Plaintiffs counter that Butler's facts are neither undisputed, nor stated in a light most favorable to plaintiffs. They set out the following list of points that they claim are in dispute: (1) whether Butler saw the gun in the backpack, (2) whether Tomeny ever touched Butler or reached for Butler's pistol, (3) whether Tomeny was hit and incapacitated by the pepper spray, (4) whether Tomeny yelled for Phelps to kill Butler, (5) whether Tomeny reached behind his back, (6) whether Phelps or Tomeny was shot first, (7) whether Phelps slipped and fell as he ran, (8) whether Phelps was taking

-19-

the rifle out of the bag when shot, (9) and whether Butler warned Phelps before shooting him.

In his reply brief, Butler asserts that all of these facts are either immaterial to the key legal issues in the case or are actually not in dispute. The Court finds that his assertion of immateriality appears correct, but only as to certain items. For instance, whether Phelps fell or intentionally knelt behind the bag, whether he actually tried to remove the rifle or was simply in a position to do so at a time when it would have appeared that was his intent, whether Butler gave a verbal warning before shooting, and who was shot first matter little, if at all, if the other facts are as Butler claims. Even somewhat more important facts, such as whether Tomeny touched Butler or whether Tomeny was hit by the pepper spray would not appear, by themselves, to carry controlling weight in the case. Instead the case really turns on disputes about whether Butler did or did not see the gun, whether Tomeny yelled for Phelps to kill Butler just before Phelps ran to the backpack, and whether Tomeny was reaching behind his back at the time he was shot. The Court will examine these three issues further, construing the evidence in the light most favorable to plaintiffs.

Taken as a whole, Phelps' deposition testimony indicates that Butler did not see the gun because he could not have seen the gun without the main compartment of the backpack being opened. Phelps describes being in a position to see whether this occurred and states clearly that it did not.

Butler attempts to negate Phelps' testimony in two ways. First, he points out that Phelps did not report the fact that the main compartment of the bag was not opened to earlier investigators in the case and that he allegedly told an Army interviewer that he did not know whether Butler saw the rifle before the shooting occurred. This line of argument has some relevance, but is not sufficient. Initially, it is not clear why Phelps would have been expected to spontaneously report that an event did not occur, nor, for the most part is it clear that he was asked if it did. The exception is an interview conducted by Lieutenant Colonel Robert McEachern, who questioned Phelps about the incident while Phelps was still in the hospital recovering from his wounds. In his notes from that interview, McEachern did state that Phelps did not know whether Butler saw the rifle. (Phelps Dep. Ex. 5 p. 1)

There are a number of readily apparent problems with Butler's use of the statement: it is a hearsay statement from McEachern, Phelps was not under oath, he was sedated at the time it was given, it is not clear what questions were asked of Phelps by McEachern to elicit the answer set out in the report, and it is not clear from the report that Phelps knew the precise moment in time being referred to or that the moment was the one just before the struggle over the bag occurred. Id. The bottom line is that Butler is attempting to use an unclear, unsworn statement purportedly made by Phelps to contradict Phelps' sworn deposition testimony. This is not permitted at summary judgment. Vathekan v. Prince George's County, 154 F.3d 173, 180 (4th Cir. 1998).

-21-

Butler attempts to work around this problem by noting that Phelps was shown McEachern's report at his deposition and asked whether he disagreed with the report. (Phelps Dep. pp. 301-303) He replied that he disagreed with a section of the report that stated that he got behind the patrol car, heard two shots, and then got up to run. He noted no other specific disagreements with the report. Butler would apparently have McEachern's report become Phelps' testimony on the issue of whether or not Butler saw the gun because "[w]hen given the chance to do so at his deposition, Phelps did not disagree with this statement." (Butler Reply p. 4)

Unfortunately for Butler, the examination at the deposition was not nearly sufficiently complete for the Court to find that Phelps in fact essentially testified that he did not know whether or not Butler saw the gun. The exchange between Phelps and Butler's counsel concerning the report was both brief and general. Counsel never asked specifically about the portion of the statement he now wishes to use to create an internal conflict within Phelps' deposition testimony. Without this type of questioning, there is no way to tell whether Phelps, in scanning the report after it was handed to him, even became aware of the comment about not knowing if Butler saw the gun. As will be discussed next, there were points in his deposition when Phelps was specifically questioned about whether Butler saw the gun and his testimony is quite clear that it was not possible for Butler to have seen it. Given the brief and general nature of the questions concerning the report, the information in the report cannot be used by Butler to create a

-22-

conflict with Phelps' responses to more specific questions. Moreover, even if some ambiguity were established, it would not be appropriate to resolve the conflict at the summary judgment stage of the proceedings.

Butler's second attack on Phelps' testimony is more direct. He notes correctly that lay witnesses cannot testify to events about which they do not have personal knowledge. Fed. R. Evid. 602. He then asserts that Phelps was "sitting with his head down and eyes closed in the truck on the opposite side of the bag from where Butler was standing" and that Phelps "admits that he could not see what Deputy Butler could see and that he does not know what Butler saw." (Butler Reply p. 4, citing Phelps Dep. pp. 170, 181-182, 195, 299-300, 350) These characterizations of Phelps' testimony are overly narrow and somewhat inaccurate.

Phelps' most specific testimony on his positioning is actually that he was sitting five feet from the bag, perpendicular to where Butler and Tomeny were standing and that the bag was between the three of them. (Phelps Dep. pp. 181, 195) He agreed that he was looking at different side of the bag than Butler, but rejected the characterization of his position as "opposite." (Id. p. 195) More importantly, he testified that his eyes were "squinting" as he pretended to be asleep. (Id. p. 182) When asked directly if his eyes were closed, his response was, "Not to the point where I couldn't see. . . . "Only to the point where I could still see, but from a couple of feet away, it appears as though your eyes were closed." (Id. p. 350) The bottom line is that, however Butler may

-23-

wish to describe Phelps' testimony, Phelps' positioning and the aperture of his eyes was such that he easily satisfies the personal knowledge requirements of Rule 602.

There is also the question of whether Phelps can specifically testify that Butler did not see the gun in the backpack. It is true that Phelps made a literal statement that he could not see what Butler saw and did not know what Butler saw. However, it is also undeniably true that when read in context, Phelps' testimony is that while he does not know what Butler did see, he knows that it was not the gun in the backpack. Phelps' deposition testimony is unequivocal on this point and he has explained the basis for his testimony.

Phelps stated that the bag was in Tomeny's possession, that he was turning it over pretending to look for the zipper to the main compartment and stalling, and that Butler became upset and tried to take the bag. (_Id_. pp. 191-193) The following exchange then ensued:

> Q. (By Mr. Wood) Do you know if Deputy Butler saw inside the main compartment of the bag
> **A. No.**
> Q. You don't know if he did or not?
> **A. Tallas was turning the bag, looking for the zipper. At the point where it was pulled initially, if the bag had been opened, the contents would have fallen out. At the point where he went for it a second time and got ahold of it, there was nothing significant that happened from the first time. And that action the second time, pulling it away and throwing it, didn't result in a pause and a look.**
> Q. There was an automatic weapon inside of the bag; correct?
> **A. Yes.**
> Q. Do you deny--Well let me ask you this: Do you have any reason to dispute Deputy Butler's testimony that

-24-

he saw inside the bag and saw what he thought to be two machine guns?

**A. Yes.**

Q. Why do you dispute that?

**A. Because prior to reaching for the bag the first time, Tallas had the bag, looking for the zipper, upside down looking, turning. If the bag had been opened, the contents would have fallen out. Nothing happened between the first and second reach for the bag, other than push, grab again.**

Q. Okay. Well let's back up because you've talked about two grabs, and I'm not sure I understand that. Explain to me--when you say that Deputy Butler first got upset, what do you mean when you claim he got upset? When did that happen?

**A. When he reached for the bag from Tallas.**

Q. Okay. Do you know what Deputy Butler saw?

**A. Do I know--**

Q. Were you in any position--are you in any position today to dispute what Deputy Butler claims he saw?

MR.MAHONEY: Objection

**A. I was sitting five feet away.**

Q. (By Mr. Wood) Were you on the opposite side of the bag [from the one] that Deputy Butler was [on]?

**A. No. The bag was between myself and the two of them.**

Q. But he's looking at one side of the bag and you're looking at the other; correct?

MR. MAHONEY: Objection

**A. Yes.**

Q. (By Mr. Wood) Could you see what Deputy Butler could see?

**A. No.**

Q. Were you standing where Deputy Butler was standing?

**A. No, I was not.**

Q. So, if Deputy Butler saw what he thought were two machine guns inside the bag, do you have any reason to dispute that he was able to see inside the bag, at least see some portion of the M-4?

**A. Yes.**

Q. And again, I ask you why do you say that?

**A. Because just prior, Tallas had the bag. He was turning it. He turned it upside down. He's still looking for the zipper. Tallas still has control of the bag. If the bag had been open, parts, pieces, stuff that was in the bag would have fallen out.**

**The bag's dark inside. An M-4 is all black. To see in there, one, it's not open, but to see all black in a bag that's not open because the contents would have fallen out when they were upside down, yes is my answer.**

-25-

Q. Well, does the bag have to be completely open in order to be able to see inside of it?

**A. A bag would have to be open to a specific number of inches along the zipper or the line of the zipper to see inside of it.**

Q. Did you see Lieutenant Tomeny open and close the zipper on more than one occasion?

**A. Open and close the zipper for the main compartment?**

Q. Correct.

**A. No.**

Q. You didn't see that?

**A. No.**

Q. So your testimony today is that there's no way possible that Deputy Butler could have seen inside the bag?

**A. Yes.**

Q. That's your testimony today? And that the bag contained an automatic weapon?

**A. Are you asking me if the bag contained an automatic weapon?**

Q. I'm asking you if the bag contained an automatic weapon.

**A. Yes, it did.**

Q. And so you're saying that sitting from an opposite side of the bag five feet away, pretending to be asleep, and not standing where Deputy Butler was standing, you're positive there's no way you could have seen inside that bag and seen some portion of that automatic weapon?

MR. MAHONEY: Objection. Answer the question.

**A. Yes.**

(Phelps Dep. pp. 193-197)

Thus, Phelps repeatedly stated that Butler could not have seen the gun in the backpack and provided logical reasons why this was so. He concluded the sequence above by affirming that he was "positive" that Butler could not have seen the gun. Not only this, but Leiber testified in his deposition that he never saw anyone open the main compartment of the backpack. (Leiber Dep. p. 61) In contrast, Butler claims that he unzipped the backpack himself and saw the weapons. Nothing in Phelps' or Leiber's testimony supports that scenario. Thus, a true issue of material disputed facts

-26-

remains as to whether Butler saw the gun in the bag prior to pepper spraying Tomeny and shooting Tomeny and Phelps.

The second time Butler claims to have seen the weapon was when Phelps allegedly grabbed the bag and tried to remove the weapon. This could pose a problem for plaintiffs even if Butler did not initially see the gun in the bag when tussling with Tomeny, especially if the jury should find that Tomeny was yelling for Phelps to kill Butler. However, the evidence on this issue is clearly disputed. Phelps denies he ever reached in the bag and pulled out the weapon. (Phelps Dep. p. 217) He claims he grabbed the bag and was running away when he heard Tomeny being shot, landed on all fours as he slipped while stopping, turned toward the gunfire, and then was immediately shot himself. (Id. pp. 221, 242-243).

The second important factual dispute is over whether or not Tomeny yelled that Butler was dead and told Phelps to kill Butler. According to Butler, when he attempted to pepper spray Tomeny, the spray missed and Tomeny began yelling "It's too late. It's too late, you're dead." He then pointed in an unspecified direction and said "You're dead. You're dead." Tomeny allegedly yelled to Phelps, "Go ahead. Shoot him. Kill him; kill him," and also screamed "Kill him now." (Butler Dep. p. 253) It was at that point that Phelps got up, leapt from the truck and grabbed the backpack. (Id.)

Phelps' deposition testimony concerning this portion of the incident is different from Butler's rendition. He believed Tomeny

-27-

was hit by the pepper spray based on his reaction. Phelps related that Tomeny was speaking loud enough for Phelps to hear and that he heard Tomeny cursing and saying something "in the nature of," "'What are you doing? Stop,' with profanity mixed in." (Phelps Dep. p. 210) Phelps could not hear what Tomeny was saying otherwise, but specifically denied that he ever heard Tomeny say, "'Shoot Mr. Butler.'" Id.

In his reply brief, Butler characterizes his testimony on this point as "undisputed." He does so based on the fact that Phelps admitted that he did not hear all of the words uttered by Tomeny. However, as with McEachern's report, the questioning of Phelps in his deposition is not sufficient for Butler to prevail on this point. The questioning certainly establishes that Tomeny uttered some words that Phelps was able to hear and other words that he was not able to hear. It also makes clear that Phelps never heard Tomeny say the exact words "Shoot Mr. Butler." Still, he was not asked whether or not he heard the more extensive statements testified to by Butler.[2] More importantly, Phelps was not asked whether the words he could not understand could have been those testified to by Butler or even whether the length of the words he could not understand would have been similar in length to the statements testified to by Butler. It is just not clear from the

---

[2]At various times in his deposition, Butler and the attorneys make reference to the "shoot him" or "kill him" statements alleged to have been made by Tomeny. They vary in length and detail. However, Butler made it clear that, whatever the exact nature of the phrases he contends Tomeny yelled, the phrases added together to form a statement of some length, because Tomeny repeated it "over and over and over." (Butler Dep. p. 299)

record in front of the Court whether Phelps missed a word here and a word there, or whether he would agree that Tomeny made extensive statements that he could not understand.

Due to the state of the record before it, the Court is left with Butler testifying that Tomeny repeatedly yelled for Phelps to kill Butler and Phelps testifying that, although he was in a close proximity with and could hear Tomeny, he did not hear any order to shoot Butler. Not only this, but he reports having heard different words from Tomeny altogether. In other words, Phelps says he did not hear what Butler claims to have heard and Butler appears not to have heard what Phelps claims to have heard. For this reason, the differences in their testimony is not merely a matter of one witness hearing everything that was said and one hearing only parts. The two men report hearing very different utterances which do not match at all. It is not as if the statements heard by Butler simply "fill in the blanks" of Phelps' testimony. Not only this, but it is worth noting that Butler claims that Tomeny was pointing as he told Phelps to shoot Butler. Neither Phelps nor Leiber reports having seen this gesture.

In the end, viewing all of the evidence in the light most favorable to plaintiffs, Phelps was in a place where he could have heard Tomeny yelling for him to kill or shoot Butler and he did not hear this. In instances such as this, the Court cannot simply ignore the fact that a witness did not hear something that they should have heard. The Fourth Circuit has found summary judgment inappropriate in similar circumstances. See Clem v. Corbeau, 284

-29-

F.3d 543, 551 (4th Cir. 2002)(defendant officer reported hearing threat, but another officer and a witness in same breakfast nook as person alleged to have made the threat did not hear one); Vathekan v. Prince George's County, 154 F.3d 173, 180 (4th Cir. 1998)(witness' sworn statement that he did not hear a warning before a police officer released a police dog created a dispute with officer's claim a warning was given where witness was in position to hear a warning, but did not).  It is likewise inappropriate here.

Finally, there is a dispute between the parties as to whether or not Tomeny was reaching behind his back at the time he was shot. Butler has very clearly testified, not only that he was, but that he did so for at least more than a brief instant.  Butler claimed in his deposition that, after Phelps ran and grabbed the bag, Tomeny began reaching behind his back as if trying to get something out of his pants.  He continued to do so as Butler turned, warned Phelps, shot Phelps, and then turned again to face Tomeny.  (Butler Dep. pp. 254-255, 309-311, 317)  This contrasts with the testimony of Leiber, who was seated in the patrol car when Tomeny was shot. He testified in his deposition that Tomeny's hands were up in the air when he was being pepper sprayed, that he was shot first--i.e. without Butler first turning to shoot Phelps--and that his hands were over his face at the time he was shot.  (Leiber Dep. pp. 54, 60, 250-251, 256)  He specifically stated that he did not see Tomeny reach behind him.  (Id. p. 256)

Case 1:04-cv-00151-WO-PTS   Document 91   Filed 07/12/06   Page 30 of 47

Butler tries to argue that the differences in his and Leiber's testimony can be dismissed as differences in "perception" because Leiber has made statements that Tomeny was "turning, twisting and hollering" before he was shot.[3]  Butler describes this as consistent with his own version of events.  This is simply not the case.  Whatever twisting, turning, and hollering Tomeny may have been doing prior to being shot, Leiber is clear that his hands were in the air or on his face, that he never saw them behind his back, and that they were on his face when he was shot.  Butler testified that Tomeny's hands were behind his back for some time before he shot him.  This is not merely a difference in perception.  Both witnesses were in a position to clearly see Tomeny's hands and they have testified that the hands were in very different locations.  A dispute of fact exists and will have to be decided by a jury.

In conclusion, plaintiffs have failed to show that Butler's stop of Leiber's truck was improper.  However, there are genuine factual disputes over whether Butler saw the gun in the backpack prior to shooting Tomeny and Phelps, whether Tomeny ever shouted for Phelps to kill or shoot Butler, and whether Tomeny was reaching behind his back prior to and at the time he was shot.  Butler could not and has not argued that he would be entitled to summary

---

[3]In support of his "perception" argument, Butler cites the case of Anderson v. Russell, 247 F.3d 125 (4th Cir. 2001), which in turn cites to Sigman v. Town of Chapel Hill, 161 F.3d 782 (4th Cir. 1998).  These cases are distinguishable because they involved minor discrepancies and/or witnesses with viewpoints that were significantly less advantageous than those of the police officers.  Here, Leiber was only a few feet further from Tomeny than Butler and was viewing him from roughly the same angle.  The incident took place in daylight and nothing suggests that Leiber's view was obstructed.

judgment, either directly or based on qualified immunity, if these issues were decided against him. For this reason, his motion for summary judgment will be granted as to plaintiffs' claims that he improperly stopped the truck and denied as to their claims that he used excessive force.

### 3. State Law Claims

In addition to the claims under § 1983, plaintiffs have also raised claims against Butler for assault and battery and negligence. Butler has moved for summary judgment on these claims. However, he does so primarily on the basis that the force he used was reasonable and not excessive under the circumstances. See Glenn-Robinson v. Acker, 140 N.C. App. 606, 625, 538 S.E.2d 601, 615 (2001)(setting out standard based on excessive force for assault and battery claims against a police officer). For the reasons discussed in dealing with the excessive force claims above, factual disputes exist which preclude a determination on this issue at summary judgment.

As to the negligence claim, citing the case of Hinton v. Raleigh, 46 N.C. App. 305, 264 S.E.2d 777 (1980), Butler seeks dismissal by asserting that Phelps and Tomeny were contributorily negligent. In Hinton, a decedent was found to have been contributorily negligent when police shot him. However, he participated in an armed robbery, refused to surrender to police when ordered, and then crouched and pointed at the officers. Id. at 308, 264 S.E.2d at 779. Viewing the disputed material facts in the light most favorable to plaintiffs in the present case, they

-32-

may have acted suspiciously, but it is not established that they engaged in conduct similar to or the equivalent of the decedent in Hinton.

Finally, Butler claims that the state law claims should be dismissed based on public officer's immunity.  He agrees in his brief supporting his summary judgment motion that the analysis for this type of immunity is essentially the same as the § 1983 qualified immunity analysis.  See Lea v. Kirby, 171 F. Supp. 2d 579, 584 (M.D.N.C. 2001).  Therefore, just as Butler's qualified immunity claim failed on plaintiffs' excessive force claims under § 1983, his public officer immunity claim fails as to the state law claims.

### 4.  Official Capacity Claims

Butler's only argument for dismissal of the official capacity claims against him is that they should be dismissed for the same reasons as the individual capacity claims.  Of course, as already discussed, most of the individual capacity claims remain.  To the extent that they do, Butler's reasoning as to the official capacity claims fails.  However, because the official capacity claims are really claims against the Moore County Sheriff's Office they will be addressed further below.

### B.  Claims Against Defendant Carter

### 1.  Section 1983 Claims

The official capacity claims against Butler and defendant Carter are effectively a suit against the Moore County Sheriff's Department itself.  Kentucky v. Graham, 473 U.S. 159, 165-66, 105

S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985).  In essence, plaintiffs seek to hold that entity liable based on Butler's employment as a deputy.  However, while a defendant's employment with the government can eventually lead to § 1983 liability for his employer in certain circumstances, that liability cannot be based on the theory of <u>respondeat</u> <u>superior</u> that operates in state law tort claims.  Instead, there is governmental liability only when the government entity itself can be said to be at fault for the injury to the plaintiffs.  This occurs when the violation of plaintiffs' rights is caused by an official custom or policy.  <u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658, 692-695, 98 S.Ct. 2018, 2036-2038, 56 L.Ed.2d 611 (1978).  Policy or custom can be found either in written form, in the form of decisions made by policymaking officials, or in the form of omissions by policymaking officials that show a deliberate indifference to the rights of citizens.  <u>Carter v. Morris</u>, 164 F.3d 215, 218 (4th Cir. 1999)(citing various cases from the United States Supreme Court).  The offending custom must be so widespread as to have the force of law.  <u>Board of the County Commissioners of Bryan County, Oklahoma v. Brown</u>, 520 U.S. 397, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997).

Plaintiffs' amended complaint raises two possible theories for holding the Sheriff's Department liable under § 1983.  The first of these is a failure by the Department to train Butler and other deputies in how to recognize and respond to persons involved in Robin Sage.  At summary judgment, they have neither advanced this

-34-

argument nor presented evidence to support it. They also explicitly concede their direct negligence action against Sheriff Carter based on a similar theory. (Pl. Brf. p. 5 n.6) No further discussion of the theory is necessary.

The second theory raised in the amended complaint, and one that is pursued by plaintiffs at summary judgment, is that there was a history and pattern of unlawful traffic stops and uses of excessive force by deputies with the Sheriff's Department, that the Sheriff knew of these incidents, that he condoned the conduct by doing nothing, and that Butler's alleged conduct was in keeping with the custom and practice that developed in the Sheriff's Department as a result of the lack of action by the Sheriff.

In order to establish a claim based on allegations that a pattern or practice caused their injury, plaintiffs must show that (1) an unconstitutional custom or practice was so common as to have the force of law, (2) the responsible policy makers were actually or constructively aware of its existence, (3) they failed through specific intent or deliberate indifference to stop the practice, and (4) a sufficiently close causal link exists between the unconstitutional practice and the violation of plaintiffs' rights. Spell v. McDaniel, 824 F.2d 1380, 1390-91 (4th Cir. 1987). As to the causation element, "failure to correct the known practices must be such as to make the specific violation "'almost bound to happen, sooner or later,'" rather than merely "'likely to happen in the long run.'" Id. at 1391.

-35-

Plaintiffs point to four incidents, two lawsuits, and lapses in paperwork procedures which they claim establish the necessary pattern or practice of unconstitutional acts in this case. However, as will be seen, such evidence falls far short of what is necessary.

The first incident is an arrest made on January 31, 2001 by Deputies Jimmy Smith and James Furr. According to the incident report filed in connection with the arrest and undisputed affidavits filed by defendant Carter and Deputy Furr, the deputies stopped a car in which a man named Thomas (Tommy) J. Shields was a passenger. He was well known because of a long history of drug addiction and criminal activity. This particular stop was made because the deputies were aware that a woman had claimed that "Tommy Shields" had assaulted her and another deputy had the warrant and was on his way. When the deputies relayed this information to Shields, he got upset and cursed them. They tried to arrest him, but he resisted, so they pepper sprayed him. Shields initially ran, but then surrendered when the deputies followed him. After the deputy with the warrant arrived, everyone realized that the warrant was actually for Shields' nephew, Thomas "Tommy" L. Shields. The deputies and Tommy J. Shields shook hands and everyone apologized for their mistakes. Shields never filed a complaint regarding the incident. (Carter Ans. to Requests for Prod.; Carter Aff. ¶ 7; Furr Aff.)

There is no basis for using this to establish that excessive force was a custom or practice of the Moore County Sheriff's

Department.  Tommy Shields was pepper sprayed when he resisted officers who were trying to arrest him.  It is true that the arrest itself was a mistake, but that is irrelevant to the excessive force inquiry before the Court and, moreover, if the mistake was a reasonable one, the arrest did not violate Shields' Fourth Amendment rights.  Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971).  Plaintiffs have made no showing that the force used was excessive or that the mistake leading to the arrest was not reasonable under the circumstances.  Also, Shields himself never complained about the incident.

The second incident occurred on May 12, 2001.  Two officers responded to a report of a domestic assault.  When they arrived, several people were present and they eventually arrested Lee Marsh and placed him in a squad car.  However, a man named Brian Dowdy was angry with Marsh and was still trying to get to Marsh in order to assault him.  Dowdy was warned to stay back, but persisted in trying to get to Marsh.  A deputy then grabbed Dowdy and placed him against a car with his arm behind his back.  When Dowdy calmed down, he was released, but later complained that his shoulder hurt.  He was taken to a hospital where it was discovered that the shoulder was dislocated.  It was not determined whether the injury occurred in an earlier fight that apparently occurred with Marsh or when the officer grabbed him.  Dowdy was cited and later pled guilty to resisting a public officer.  He also never filed a complaint regarding the incident.

-37-

As with the first alleged use of excessive force, the actions of the officers in restraining Dowdy do not appear to have been excessive. Brian Dowdy was physically restrained by an officer, as he ought to have been, while actively trying to assault an individual who was already in police custody. The officer used no pepper spray or weapon and merely pushed Dowdy's arm behind his back before releasing him when he calmed down. While Dowdy's shoulder was injured, the fact of injury alone does not show the force to have been excessive. Moreover, it is not clear whether the injury occurred as a result of the use of force by the officer, as opposed to the earlier fight. Dowdy also did not file a complaint and pled guilty to resisting a public officer. Plaintiffs cite nothing to show that pushing an assailant's arm behind his back is an excessive use of force when it is done to prevent a physical assault. (Carter Ans. to Requests for Prod.; Carter Aff. ¶ 8; Lineberry Aff.)

The third incident involved Butler himself and his arrest of David Brewer. Butler spotted an automobile with a flashing yellow light on top of it and occupied by four or five young males. Brewer, who was driving, took his eyes off the road, put his head out of the window, and shouted "pig, pig, onk, onk, onk [sic]." (Carter's Ans. to Req. for Prod. of Docs. No. 25 Incident Report) He did so while driving in a town and "rapidly approaching a stoplight." (Butler Aff. ¶ 4) Butler stopped the vehicle and asked Brewer why he was yelling and not watching the road. Brewer denied knowing what Butler was talking about. Butler then detected

-38-

an odor of alcohol coming from the vehicle and asked Brewer to step out so that he could determine whether it was Brewer who smelled of alcohol. As Brewer stepped out, Butler shut the door behind him. Brewer cursed Butler and told him that he had shut the door on his leg. Butler told Brewer not to yell provoking comments, that it was disorderly conduct, and that it made him look like "white trash or a punk." (Id.) Brewer then cursed Butler and bumped him with his chest.

Butler arrested Brewer for disorderly conduct and driving while impaired. In doing so, he grabbed Brewer's left arm and pushed him against the patrol car. Brewer resisted by attempting to turn back around to face Butler. Butler then forced him onto the sidewalk and arrested him. On the way to the station, Brewer threatened Butler several times. Brewer eventually tested positive for the presence of alcohol and was charged with driving while intoxicated. He was also charged with disorderly conduct and resisting arrest. (Id. ¶¶ 12-15) Later, after pleading guilty to resisting a public officer and disorderly conduct, Brewer approached Butler in a parking lot, apologized for his behavior, and promised to attempt to improve it. (Id. ¶ 15) There is no sign he ever filed a complaint about the incident.

None of these incidents show any constitutional violations. As for the specific incident involving Butler, the stopping of someone driving in a reckless manner, asking him to step out of the car to determine if an odor of alcohol is coming from him, and arresting him after he cursed and "chest bumped" the officer was

-39-

reasonable under the circumstances.  The purported shutting of the door on Brewer's leg was accidental.  After that, Butler did not use pepper spray or weapons, but merely tried to arrest Brewer by grabbing his arm.  When Brewer resisted and assaulted Butler, Butler forced him to the ground.  Plaintiffs again cite no case showing this was excessive under the circumstances.

Finally, plaintiffs point to an incident recalled by defendant Carter in his deposition.  He reported that Deputy Will Brooks stopped a male motorist who he mistakenly believed to have been involved in an armed robbery.  Brooks ordered the man out of the car at gunpoint before realizing his mistake.  He then allowed the driver to leave.  A representative of the NAACP later came to the Sheriff's office to make a complaint.  Carter spoke with her, explained the reason for the stop, and she departed without pursuing the matter further.  As with the other incidents, plaintiffs make the bald, unsupported statement that excessive force was used, without citing any law to support their allegations.  This is not sufficient.  In any event, the incident actually occurred sometime after Carter became Sheriff in December of 2002 and well after Tomeny and Phelps were shot in February of 2002.  (Carter Dep. pp. 11, 60-62)[4]

---

[4]It should be noted that the above descriptions of the four incidents are based on the incident reports, as well as some statements from depositions or affidavits.  Plaintiffs' descriptions of the incidents in their brief are different, sometimes considerably so, in ways too numerous to address specifically. However, the differences exist because plaintiffs' account tended to sensationalize, mischaracterize, or render incomplete accounts of the incidents.  They included inferences not supported by the record.

In addition to the four incidents, plaintiffs also note that Butler was once sued for using excessive force when he was a police officer in Sanford, North Carolina, that the Sheriff's Department hired him anyway, and that the Department was itself being sued in federal court at that time in an excessive force case.[5] Also, plaintiffs claim that the officers involved in the four incidents set out above failed to follow proper procedure by not filing use of force reports or recording citizen complaints. Plaintiffs allege that failing to follow proper use of force procedure created a laxity in the department that made the shooting and killing of arrestees "almost bound to happen sooner or later." Spell, 824 F.2d at 1391. The Court finds this argument attempts to reach much too far.

Based on the four incidents, the two lawsuits, and the alleged failure to follow proper procedure, plaintiffs have constructed the following scenario. They say that Sheriff's deputies, including Butler, were engaging in excessive uses of force, that they were not filing proper reports, that the Sheriff at the time would have been aware of this by reading the incident reports that were filed, and that the Sheriff took no measures to stop the use of excessive force or compel his employees to file the proper reports. They also claim that the incident involving Butler and Brewer shows that Butler "has a mean temper and will explode when his authority is challenged." (Pl. Resp. p. 8) Plaintiffs conclude that this lack

_____

[5]The case against Butler was settled over his objection. (Butler Dep. pp 37-39, 42) The case against the Sheriff's Department resulted in a defense verdict in February of 2000. (Pl. Resp. to Carter's Mot. for Summ. Judg. p. 2)

of supervision and rule enforcement by the Sheriff let his deputies know that they could use excessive force without fear of investigation or discipline. Plaintiffs also address causation, stating that the Sheriff's failure to require uses of force to be reported in written form "would have led Butler to believe that he could pull his gun and use it without ever having to give an official justification for his actions." (Pl. Resp. p. 13)

The problems with plaintiffs' theory are obvious. They have not shown that any of the incidents involved a use of excessive force. Moreover, there is no evidence of a pattern or practice of unconstitutional behavior. As to improper procedure, at most, this shows a failure to follow policy on what paperwork needs to be completed. Plaintiffs fail to show sufficient prior examples of excessive force so that it could be inferred that the failure to file reports would lead deputies to believe that use of not just excessive, but extreme excessive force was condoned. Finally, there is no proof whatsoever of causation. Even if excessive force was used in the three incidents preceding the events of this case, the force used was one deployment of pepper spray when a person resisted, two occurrences of putting someone's arm behind their back, and one instance of someone being forced to the ground. Nothing in plaintiffs' proposed evidence of past misconduct rises to the level of establishing a pattern and practice of arrest that would have led Butler to believe that he could use pepper spray and then shoot two people without having to justify his actions. See Carter v. Morris, 164 F.3d 215, 218-19 (4th Cir. 1999)(accusations

of unrelated violations don't prove sufficient connection to risk of a specific injury).

In addition to their excessive force/pattern or practice theory under § 1983, plaintiffs also seek to hold the Sheriff's Department liable for failure to train and supervise officers regarding uses of force.  To prevail on this type of claim, plaintiffs must show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton, Ohio v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).  Plaintiffs argue that the need for more training on the proper use of force was obvious based on the incidents already described.  However, this theory fails for the same reasons as plaintiffs' general pattern or practice claim.  Therefore, defendant Carter's motion for summary judgment as to the § 1983 claims raised against him will be granted.

## 2.  State Claims

In addition to attempting to hold Sheriff Carter liable for Butler's alleged § 1983 violations, plaintiffs also seek to hold him liable on certain state law claims.  One theory they pursue is that Carter is liable on the state law assault and battery and negligence claims against Butler on the basis of respondeat superior.  A second theory, which is raised in the amended complaint, is that the Sheriff's Office was directly negligent for failing to inform its employees that Robin Sage was occurring or

-43-

train them on how to recognize Robin Sage participants. Plaintiffs have conceded their direct negligence claim and now pursue only the respondeat superior claims based on Butler's actions.

Regarding those claims, Carter makes two arguments. The first is that Butler did not commit a tort, so that there is no basis for holding the Sheriff's Department liable. Of course, this argument does not prevail because it has already been determined that questions of fact remain regarding whether or not Butler committed any torts. Carter's second argument is that he is entitled to governmental immunity as to plaintiffs' intentional tort claims.[6]

North Carolina law generally provides immunity for government entities if their employees commit torts while performing governmental functions. Messick v. Catawba County, North Carolina, 110 N.C. App. 707, 431 S.E.2d 489, 493-94, rev. denied, 334 N.C. 621, 435 S.E.2d 336 (1993). It covers both intentional and negligent acts. Dickens v. Thorne, 110 N.C. App. 39, 429 S.E.2d 176 (1993). This immunity may be waived through the purchase of liability insurance. Messick, 110 N.C. App. at 714, 431 S.E.2d at 493-494.

Plaintiffs do not dispute that, absent waiver, governmental immunity would cover their official capacity intentional tort claims against Carter. However, they make two arguments that waiver has occurred. The first of these is that immunity has been

_____

[6]In seeking governmental immunity only as to plaintiffs' intentional tort claims, defendants implicitly concede that governmental immunity does not exclude plaintiffs' negligence claims. The reason for this appears to be based on the existence of certain insurance coverage that will be discussed below.

-44-

waived by the statutorily required purchase of a bond by the Carter. All sheriffs in North Carolina are required to purchase such bonds. N.C. Gen. Stat. 162-8. Not only this, but "[e]very person injured by the neglect, misconduct, or misbehavior in office of any clerk of the superior court, register, surveyor, sheriff, coroner, county treasurer, or other officer, may institute a suit or suits against said officer or any of them and their sureties upon their respective bonds." N.C. Gen. Stat. 58-76-5. Such suits can be maintained not just for the actions of the sheriffs themselves, but also based on the actions of their deputies while acting under color of law. Thus, the statutory bond works as a waiver of the governmental immunity of sheriffs and their deputies where, as here, the surety is joined as a party. <u>Messick v. Catawba County, North Carolina</u>, 110 N.C. App. 707, 714-15, 431 S.E.2d 489 (1993), <u>implied</u> <u>overruling</u> <u>recognized</u> <u>on</u> <u>other</u> <u>grounds</u>, <u>Boyd v. Robeson County</u>, 169 N.C. App. 460, 621 S.E.2d 1 (2005). This waiver covers the torts of assault and battery. <u>State ex rel. Cain v. Corbett</u>, 235 N.C. 33, 69 S.E.2d 20 (1952).

For the reasons just set out, it is clear that Carter's governmental immunity for plaintiffs' official capacity tort claims has been waived under North Carolina law by the purchase of the statutory bond. Indeed, Carter has not denied that immunity is waived to the extent that the bond exists. What he has argued is that a separate insurance policy purchased by Moore County, and covering employees of the Sheriff's Department, does not cover

-45-

intentional torts. This assertion is grounded in a provision in the policy that excludes:

> any claim for damages arising out of fraudulent, dishonest, or criminal behavior, including the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the Participant, and claims or injury arising out of the willful, intentional or malicious conduct of any Covered Person;

(Wyatt Aff. Ex. A. § 5 Subpart F(4))[7]

In one sense, Carter's argument is irrelevant at this point because waiver of his governmental immunity has already occurred due to the existence of the statutory bond. All of the tort claims against him in his official capacity will go forward and he will need to mount a defense against them. Total dismissal of the claims cannot occur. What the argument is really aimed at is determining the extent of the waiver.

Unfortunately, because the waiver or non-waiver is based on interpretation of an insurance policy, Carter's argument actually seeks the equivalent of an advisory opinion concerning whether insurance coverage exists. The opinion would be advisory because the party most affected by the decision, the insurance company, is not represented before the Court and has not had an opportunity to argue its interpretation of the policy provision. For this reason, the Court will not address the coverage issue, but will leave a

---

[7]The applicable parts of the exclusion were quoted correctly in Carter's brief, but incorrectly in plaintiffs' response brief and Carter's reply brief where the language quoted was mistakenly typed as "and claims _for_ injury" rather than "and claims _or_ injury." It is not clear, but this misquotation of the policy may have led to some of the disagreement between the parties.

-46-

final decision on the matter for such time, should it be necessary to make the decision.

### C. Claims Against Fidelity Mutual

Fidelity Mutual also seeks summary judgment. It does so on the ground that plaintiffs cannot show that Butler committed any tort for which Fidelity may be liable as the surety on Carter's statutory bond. Of course, Butler's commission of the alleged torts is an issue for trial and Fidelity's motion for summary judgment will be denied.

**IT IS THEREFORE ORDERED** that Randall Butler's motion for summary judgment (docket no. 50) be, and the same hereby is, granted with respect to plaintiffs' claims that he violated their rights under the Fourth Amendment when he pulled over the vehicle in which they were riding and denied in other all other respects.

**IT IS FURTHER ORDERED** that defendants Lane Carter and Fidelity and Deposit Company of Maryland's motion for summary judgment (docket no. 48) be, and the same hereby is, granted as to plaintiffs' claims under 42 U.S.C. § 1983, granted as to plaintiffs' direct negligence claims against defendant Carter, and denied as to plaintiffs' other state law tort claims.

_____
United States Magistrate Judge

July 12, 2006

-47-